## Case No. 6,435.

### HERWIG v. OAKLEY.

[Taney, 389.] [1]

Circuit Court, D. Maryland.    April Term, 1838.

BOTTOMRY BOND—FRAUDULENT ACQUITTANCE—WAIVER—PURCHASER—NOTICE.

1. Oakley advanced money, at New York, on bottomry, for the repairs of the schooner Isabella (afterwards Rosamond), of Port au Prince; the bond was dated 16 November, 1829, and payable sixty days after the arrival of the vessel at Port au Prince, where she arrived on the 12th of December, 1829; the title to her, at the time of the bottomry, was, according to her papers, vested in Dupesne, a merchant of Port au Prince, father-in-law of R. A. Windsor, the principal of the firm of Windsor & Co.; Oakley sent the bottomry-bond to Windsor & Co. for collection, supposing them to be the charterers; and they, on the 10th of January, 1830, endorsed on the bond the following acquittance: "We hereby acquit Messrs. L. Dupesne & Co., owners of the schooner Isabella, as well as the said schooner, collectively or individually, of all liability or responsibility that might arise from this bottomry-bond, which, being entrusted to us by Mr. Oakley, we now cancel and annul, acknowledging ourselves to be the sole debtors to Mr. Oakley of the amount of disbursements paid by him on the schooner in New York, the said amount being, according to agreement, entered to our own account:" prior to the execution of this acquittance. a letter dated 31 December, 1829, had been despatched by Windsor & Co., to Oakley, stating that they were the owners of the schooner, and that his advances on her account would be promptly remitted by them; Oakley, not knowing of the above acquittance, brought suit in the Haytien court, against Windsor & Co., and obtained judgment on the 14 September, 1830, on an account, in which the amount of the bottomry-bond was included. On the 30 December, 1830, Herwig (the claimant of the vessel) purchased her from Dupesne, who exhibited to him the bottomry-bond, with the acquittance of Windsor & Co. written upon it: at the time he made this purchase, Herwig was acquainted with the fact of the judgment recovered by Oakley against Windsor & Co., and that, notwithstanding this judgment, and the acquittance written on the bond, Oakley claimed his lien on the vessel under his bottomry-bond, as still subsisting. No evidence was offered by Herwig to prove that he paid full value for the schooner, and immediately after the purchase he changed her name to "Rosamond," and sent her to a port of the United States to which she had not been accustomed to trade: Windsor & Co. stopped payment in the month of September preceding the sale to Herwig. On a libel filed by Oakley, to enforce his bottomry-lien: *Held*, that the acquittance of Windsor & Co. was a fraud upon the libellant, and a mere nullity, and did not in any degree impair the security of the bottomry-bond.

2. The suit brought and judgment recovered by Oakley in Hayti, being in ignorance of the facts constituting the fraud, did not amount to a waiver of the bond. But it would have amounted to a waiver, if it had been done with a knowledge of all the facts.

3. Herwig could not hold the vessel discharged from the lien of the bond, as he was a purchaser with notice of Oakley's claim. His opinion as to the validity of that claim, did not alter his predicament; he had notice that Oakley made the claim, and having this notice, he bought at his peril, and the property in his hands was bound to the same extent and in the same manner as it was in the hands of the person from whom he purchased.

[Appeal from the district court of the United States for the district of Maryland.]

In admiralty.

Charles F. Mayer, for appellant.

J. Glenn, for appellee.

TANEY, Circuit Justice. This is a proceeding on the part of Charles Oakley, to charge the schooner Rosamond, formerly the Isabella [Ernest C. Herwig, claimant], with the amount due on a bottomry-bond, executed at New York, 16 November, 1829. The vessel belonged to Port au Prince, in Hayti, and was consigned, with her cargo, by R. A. Windsor & Co., merchants of that place, to Oakley, the libellant; after her arrival in the port of New York, she was found to require extensive repairs to make her seaworthy, and the master having no funds, and being unable to raise the money, Oakley made the necessary advances on bottomry, and took the bottomry-bond from the master to secure himself. At the time the money was advanced by Oakley, and the bond taken, he did not know who were the real owners of the vessel, and had no funds of Windsor & Co. in his hands. The bond is on the schooner Isabella (now called the Rosamond) for $1145 97, with seven per cent. interest, payable in sixty days after the arrival of the vessel at Port au Prince. She sailed from New York, a few days after the execution of the bottomry-bond, and appears, by a letter from Windsor & Co. to Oakley, to have arrived at Port au Prince before the 12th December, 1829.

The bond was sent by Oakley to Windsor & Co., for collection; and it appears by the testimony of Roome, the clerk of Oakley, that it was forwarded to them, under the impression that they were the charterers, and not the owners of the vessel. There were other accounts and dealings between the parties, and when Oakley, at the end of

[2] [From 8 Chi. Leg. News, 274.]

[1] [Reported by James Mason Campbell, Esq., and here reprinted by permission.]

the year, transmitted his account to Windsor & Co., the amount of the bottomry-bond was charged against them, because the bond had been sent to them for collection.

The title to the vessel, at the time of the bottomry, was, according to the vessel's papers, in Dupesne, a resident merchant of Port au Prince; and Heyliza, the master, and R. A. Windsor, the principal of the firm of R. A. Windsor & Co., both swear that the vessel was the property of Dupesne. But the master does not appear to have had any means of knowledge on the subject, except what he derived from the schooner's papers; and the conduct of Windsor has been such, that the court must regard his testimony as entitled to but little consideration; for, in the letter of R. A. Windsor & Co. to Oakley, dated 12 December, 1829, in reply to Oakley's letter informing them of the bottomry, and that he did not know who owned the vessel, they state that the schooner belongs to them; and they repeat this statement in another letter to him, dated 31 December, 1829, and mention that they are about to send him an account of damages sustained on her voyage, by stress of weather, in order to obtain compensation from the underwriters.

Now, after such statements made to their commercial correspondent in New York, who, it appears from the papers in the case, was in advance for them on other accounts, Windsor comes before the court with an ill grace, when he appears here to prove that the schooner, at that time, belonged exclusively to Dupesne, and that his firm had no interest whatever in her. The testimony of such a witness cannot be respected, nor allowed to have any weight in the decision of this controversy.

Besides, his testimony is not only inconsistent with his letters, but it is inconsistent with other acts to which he was a party; his acquittance on the bottomry is made to "Messrs. L. Dupesne & Co., owners, collectively and individually;" but he states in his testimony, that Dupesne was her "lawful and only owner," and yet he gives no explanation of the reason for making the acquittance to "Messrs. L. Dupesne & Co., collectively and individually," instead of making it to Dupesne himself, "her lawful and only owner." The schooner was, certainly, documented in the name of Dupesne alone, and there is nothing in the evidence to show that this vessel was ever owned by the firm of "Messrs. L. Dupesne & Co.," except this acquittance; nor is it stated who composed the firm of Dupesne & Co.; neither does he inform us who composed the firm of R. A. Windsor & Co.; he states that he was the principal partner, and that he purchased the vessel in 1827.

Now, according to his own showing, he was, at that time, only seventeen years of age; for, in his deposition taken in 1833, he is stated to be at that time about twenty-three years of age. It cannot readily be imagined, that one so youthful could have been placed at the head of a firm carrying on such extensive business, unless his associate was some person who felt a peculiar interest in his welfare, and was willing to advance the interests of R. A. Windsor at some hazard to himself. Dupesne was his father-in-law; he may have been the partner in this firm, and taken the documentary evidence of ownership on account of the youth of his son-in-law; neither Windsor nor Dupesne states the time when the schooner was documented in the name of Dupesne; both of them carefully evade that point. Windsor says he purchased her in 1827, and that she then changed flag and name; but whether her new papers were in the name of Windsor & Co., or in the name of Dupesne, is not stated; he tells us that he sold her to Dupesne in 1829; this may be literally true, and yet the sale may have been made, after he was informed of the bottomry; for he received information of the bottomry-bond before 12 December, 1829, and the sale may have been afterwards and before the close of the year. Now, if there had been a real and bonâ fide sale of this vessel in 1829, before the bottomry, it cannot be doubted, that Windsor would have given the date, and would not have answered in this loose and equivocal manner, which leaves it doubtful whether the alleged sale was before or after the bottomry.

Dupesne seems to be equally unwilling with Windsor to give the date of his purchase; he is asked by the libellant, "At what time he purchased the schooner, and from whom?" And he answers "All the documents are in the possession of E. C. Herwig;" this is his whole answer. It is a manifest evasion of the question, and an attempt to put the case exclusively on the formal documents of the vessel; and is a refusal to give to the libellant the information he asked for.

Dupesne knew, from the very nature of the proceeding, that Oakley disputed the validity of the acquittance which he had received on the bottomry, and if his own conduct in that matter had been free from reproach, he would gladly have availed himself of the opportunity of explanation offered him by the libellant, and have given a frank and full account of his connection with Windsor & Co. and the schooner. There is no reason to suppose that the documents of the vessel, in relation to her ownership, were ever changed, after she was purchased by Windsor & Co. in 1827, until she was sold to Herwig in 1830; and from the manner in which Windsor and Dupesne testify, taken in connection with the other testimony in the case, their collusion and co-operation with each other in this business, are too evident to be mistaken. The acquaintance itself strongly implies that no money was paid by Dupesne to Windsor, in discharge of the bottomry. The acquittance is in the following words:

"We hereby acquit Messrs. L. Dupesne & Co., owners of the schooner Isabella, as well as the said schooner, collectively or individually, of all liability or responsibility that might arise from this bottomry-bond, which, being entrusted to us by Mr. Oakley, we now cancel and annul, acknowledging ourselves to be the sole debtors of Mr. Oakley, of the amount of disbursements paid by him on the schooner, in New York, the said amount being, according to agreement, entered to our own account. R. A. Windsor & Co. Port au Prince, 10th January, 1830."

The amount of this acquittance, according to its language, is nothing more than this —that, instead of collecting the money due on the bond, he cancels and annuls it, and avails himself of the confidence reposed in him by Oakley, to deprive him of the security he had obtained. And this instrument is secretly executed by a young man, who, at the time of its date, was only twenty years of age, to release property, which is claimed by his father-in-law, from a lien to which it was honestly and justly liable. It is impossible to acquit the father-in-law, under such circumstances, of having participated in the fraudulent intentions of the son-in-law. The court considers the acquittance as fraudulent and void; it is a mere nullity, and does not in any degree impair the security of the bottomry. It is worthy of remark that, at the moment this acquittance was executed, which treats Dupesne & Co. as the owners of the schooner, the letter of Windsor & Co. to Oakley, of 31 December, 1829, was actually on its passage to the United States, and in this letter they assure him, that Windsor & Co. were the owners of the schooner, and that his advances on her account will be promptly remitted by them.

It has been argued that, after this bond was taken, Oakley charged Windsor & Co. in account, with the amount of these advances, and afterwards included them in the account in which he brought suit against them and obtained judgment in the Haytien court; and that these acts are a waiver of the bottomry. It is true, that the advances for which the bottomry was taken were charged against Windsor & Co., by Oakley, in the account transmitted to them shortly after the bond was taken, and the same charge was continued in the account sent to Squire & Reynolds, upon which the suit was brought against Windsor & Co., and the judgment obtained against them; and if the libellant had been apprised of the acquittance, these proceedings would, undoubtedly, have sanctioned what was done, and would have discharged the schooner from the bottomry. But it is proved by the clerk of Oakley, that the item was introduced, in the first instance, in the account, because the bond had been sent to Windsor & Co. for collection, and not because it had been collected by them. Indeed, the account sent at the close of the year 1829, was prior to the date of the acquittance; and these advances were naturally and properly continued in the account of 7 August, 1830, afterwards transmitted to Reynolds & Squire, for the purpose of suit against Windsor & Co., because Oakley had been informed by them, before he sent this account, that they were the owners of the vessel.

He certainly did not mean to waive his lien and rely on the personal security of Windsor & Co., for, in the orders he sent, with the account, to Reynolds & Squire, he directed them to proceed against the vessel as well as against Windsor & Co., and they would have proceeded against her on the bond, if the laws of Hayti had permitted them to do so.

It remains to be examined, whether Herwig, the claimant, stands in a different position from Windsor & Co. and Dupesne. If Herwig had been a purchaser, without notice of the claim of Oakley, he would, without doubt, be entitled to hold the vessel discharged from the bottomry. The possession of the bottomry-bond by the party appearing on the face of the papers to be the owner, with the acquittance endorsed upon it, would have been sufficient to justify the purchase; the more especially, as Oakley had obtained a judgment in the court of Port au Prince against Windsor & Co. for the whole amount of these advances; and the loss occasioned by the breach of trust of Windsor & Co., who were the agents of Oakley, must have fallen upon him, and could not, upon any principle of justice, have been visited upon an innocent purchaser, without notice.

But Herwig was not a purchaser without notice. Reynolds states, in his testimony, that Herwig, previously to his purchasing the vessel, informed his (the witness's) firm, of his wish to do so, when they warned him against it, on account of Oakley's claim, but that Herwig informed him, that Dupesne had exhibited to him documents to prove that the claim no longer existed on the vessel. Now, the vessel was sold to Herwig on the 29th December, 1830, and this conversation took place when he was about to make the purchase; the acquittance bears date on the 10th January, 1830, and Oakley's judgment against Windsor & Co. was obtained on the 14th day of September in the same year; so that Herwig, when he was about to purchase, was warned that, notwithstanding this acquittance, and the judgment for these advances against Windsor & Co., the bottomry on the vessel was still claimed by Oakley as a subsisting lien upon her.

Herwig may possibly have considered this claim as unfounded, and that the possession of the bond by Dupesne, with the acquittance upon it, discharged the lien. But his opinion as to the validity of Oakley's claim, does not alter his predicament; he had notice that Oakley made the claim, and having this notice, he bought at his peril, and the

property in his hands is bound to the same extent, and in the same manner, as it was in the hands of the person from whom he purchased. This is the well-settled rule in courts of equity; it is founded in the principle of justice, and prevails also in courts of admiralty; and there is no department of business in which it should be more strictly enforced by courts of justice, than in commercial concerns, where, from the very nature of his pursuits, the merchant is compelled to confide in distant agents, who can easily give to fraudulent and colorable transactions, the form and semblance of real contracts.

Herwig, it seems, had seen the bottomry-bond, with the acquittance upon it, and knew that this acquittance was dated as far back as 10 January, 1830; yet, nearly a year afterwards, he is warned that Oakley still claims his bond as a lien upon the vessel. Surely this was enough to put him upon inquiry before he bought; it was enough to satisfy him that Oakley did not admit the validity of this acquittance, and if he chose, with that knowledge, to become the purchaser, he must abide the consequences, and must stand upon the title of the party of whom he purchased; and if that title was subject to this lien, the one he acquired is bound in like manner. It was his voluntary act to buy a title which he knew to be disputed; and if he loses his money, it is his own fault. The right acquired by Herwig, the claimant to the schooner, was therefore no better than that of Dupesne, and the vessel came to his hands still charged with the amount due on the bottomry-bond.

There are, moreover, strong circumstances to show that if Herwig did not collude with with Dupesne and Windsor & Co., he was yet sensible that he was purchasing a doubtful title. He avers, in his answer, that he paid the full value of the vessel, discharged from the bottomry, but he has offered no evidence to prove that the sum he paid was the full value; and immediately after his purchase, he changed the name of the schooner and sent her to a port of the United States to which she had not been accustomed to trade. These measures were well calculated to deceive Oakley, and to deprive him of the opportunity of enforcing his claim on the bottomry.

It is true, that the name of this schooner had been changed before, from that of the Robert Burns, to that of the Isabella, when she was bought by Windsor & Co., from her American owners. There was a reason for that alteration in the name; for the vessel, at that time, changed the American flag for the flag of Hayti; and the owner might very naturally suppose that the name of the Robert Burns was not very appropriate to a vessel sailing under the flag of Hayti, and that the name of the Isabella would be more suitable to her new national character. But no reason is assigned for the change of name made by Herwig; and as he had been warned that Oakley still claimed the bottomry on the vessel, this change of name and change of destination was so well calculated to mislead Oakley, and embarrass him in the pursuit of his remedy on the bond, that the court cannot regard it as an act of mere caprice or fancy; it has all the marks of contrivance and design. It does not even appear that Herwig, the claimant, was a merchant or ship-owner in any way engaged in trade before he became the purchaser of the Isabella. Windsor & Co. stopped payment in September, 1830; and the transfer is made to Herwig about two months afterwards, when it was no longer safe to send the schooner to the United States in the name of her former owners.

It has been strongly pressed upon the court, that the libellant has waived his remedy on the bottomry by his own neglect and delay. But the claimant, being a purchaser with notice, stands in the same predicament with Windsor & Co. and Dupesne, and the delay which has taken place has been occasioned by the respondent himself, or those under whose title he claims. The bond was executed at New York, 16 November, 1829, payable sixty days after her arrival at Hayti; she arrived there before the 12th December; it does not appear that she ever returned to any port of the United States, or was at any port where Oakley had an opportunity for enforcing the bond, until after she was transferred to the present claimant, on the 29th December, 1830; the libellant endeavored to enforce it at Port au Prince, where the vessel belonged, but the testimony of Reynolds shows that by the laws of that place it could not be done. After she was transferred to the present claimant, she came to Baltimore, for the first time, on the 28th February, 1831, but she came under a new name, and appeared to be owned by another person; she came again, on the 3d June, 1831, and before she left the port, on the 23d of that month, the process in this cause was issued against her. In all this the court see no want of reasonable diligence on the part of the libellant; on the contrary, he must have been vigilant and active in the pursuit of his remedy, or he could not have so soon discovered her under her new name, with her new owner, in her new place of trade, distant, as it was, from his own place of residence; and there is nothing in the evidence which can impute to him neglect or unnecessary delay, and nothing which ought to deprive him of the lien of his bottomry-bond, against a claimant who stands in the predicament of the present respondent. The decree of the district court must, therefore, be affirmed with costs.

HERZ (GARDNER v.). See Case No. 5,229.

HESS (UNITED STATES v.). See Case No. 15,358.